### No. 3690—Thomas McKnight v. The City of New Orleans.

The city of New Orleans having acquired the Waterworks by purchase from the Merchants' Bank, under a provision of the charter of the bank, has now full control of the hydrants in the streets; and as she has full control of the streets as public highways, she may manage the distribution and disposition of the water that flows through the hydrants and thoroughfares in such a way as to be of the greatest advantage to the inhabitants of the city.

A person who has heretofore had the exclusive privilege from the city of using water from the hydrants for the purpose of sprinkling the streets, can not complain if this privilege has been (in a regular way) taken from him and given to another who paid more for the water than he had paid, because it is within the power of the city, through her administrators, to withhold altogether, and from all persons, the use of water from the hydrants for the purposes of street sprinkling. An action in damages will not, therefore, lie in favor of such person who has lost the occupation of street sprinkling by the city conferring it upon another.

APPEAL from the Sixth District Court, parish of Orleans.  *Cooley,* J.  *Richard Shackelford,* for plaintiff and appellee.  *George S. Lacey,* City Attorney, for defendant and appellant.

This case was tried by a jury in the court below.

Howe, J.  In the year 1869, the plaintiff being the highest bidder, obtained from the waterworks of New Orleans the exclusive privilege

McKnight v. The City of New Orleans.

of using water from the hydrants in the streets for the purpose of street sprinkling, for which he paid the sum of nine hundred dollars; and in the same year he enjoined one Casserly from infringing this exclusive privilege.

In 1870 he was again the highest bidder, and again received and and enjoyed the same exclusive right.

In 1871, the city having become owner of the waterworks, the plaintiff was again a bidder, but not the highest one, and the privilege was awarded to Joseph Elliott for the sum of two thousand dollars.

The plaintiff at this point seems to have changed his views in regard to the legal propriety of such an exclusive privilege. He applied to the city for a supply of water to be used in the business of street sprinkling, but was refused, on the ground that the right had already been granted for one year to Elliott, a higher bidder. He thereupon commenced this action, alleging that his business of sprinkling streets, for which he was compensated by subscriptions of individual owners of property, had been broken up by this unlawful refusal, and claimed damages in twenty thousand dollars.

The cause was tried by a jury, who rendered a verdict in favor of plaintiff for the sum of five thousand dollars, and from a judgment rendered thereon the defendant has appealed.

At a first glance at the evidence in the case it might be a matter of grave doubt whether the plaintiff has sustained any such damages as can form a basis for a judgment against the city. It appears that he sold his carts at "what he asked for them," and it would not be a violent presumption to suppose that he found a ready market for his mules in the spring of the year. At least it does not appear that they were sacrificed. He then went into business as a merchant, and, perhaps, he was a gainer by the change of pursuits. The verdict seems to be composed entirely of speculative profits which, he thinks, he would have realized if he had continued the business of drawing water from the hydrants of the city and sprinkling it about the streets, and had been successful in such business.

We prefer, however, passing this point to inquire at once whether the acts of the city in the premises were of that unlawful character which would bring the corporation within that broad rule of law which declares that every act of man which causes damage to another, obliges him by whose fault it has been committed to repair the damage resulting therefrom. Was the city legally in fault?

By section thirty-eight of the act incorporating the Commercial Bank of New Orleans, it was provided that "the corporation of New Orleans shall be supplied by the said company, free of charge, with all water necessary for the extinguishment of fires and other public purposes, nor shall the City Council be subjected to any charge of water

furnished to supply the gutters of the said city and faubourgs; and that the said company, as they progress in laying aqueducts, shall place, free of any charge whatever, two hydrants of a proper construction, in front of each square, at a suitable distance from each other, from which a sufficient quantity of water may be conveniently drawn, for extinguishing fires, for wetting, washing and watering the streets and gutters, and any other public purposes; that, on the squares which do not front the river, the hydrants shall be placed on opposite sides of the streets, at an equal distance from each other, and the corners; that the said hydrants shall be of a proper size, and made so as at all times to furnish water for the fire engines, and purposes herein mentioned; it shall further be the duty of said company to supply water for all the purposes herein mentioned, at all times during the continuance of this charter, unless prevented by some unavoidable accident; and in case such shall occur, the repairs shall be made and the water again furnished, at the expiration of the necessary delay; and the said company shall supply a sufficient quantity of clear, pure and wholesome water for the use of the inhabitants within the limits aforesaid, at the elevation of fifteen feet, when the same may be required; provided, however, that said hydrants shall be under the control of the Commercial Bank."

Under the provisions of law the city became the owner, by purchase, of the waterworks prior to the events which gave rise to this action. So far, then, as any obligation of the bank to the city was concerned, it might perhaps be said that the latter became by this transfer at once debtor and creditor, and the obligation was extinguished by confusion.

"L'extinction qui en resulte est commune à toute espèce d'obligations. * * Les expressions de débiteur et de créancier employées par notre article ont un sens très é endu qui embrasse tous les engagements de quelques nature qu'ils soient. * * Larombière on art. 1300, C. N. No. 16.

But the plaintiff insists that there was a legal obligation on the part of the bank, and so on the part of the city, as transferree, to supply *him* with water for use by him in his business. We are unable to perceive this. The duty of supplying water for watering the streets was imposed on the bank in favor of the city, and, even if it still exist, is a matter in which the plaintiff has no special legal interest. The duty of supplying water to the individual inhabitant is evidently for domestic and other purposes upon private premises. A sufficient quantity of *clear, pure* and wholesome water, for the use of the inhabitants, is to be supplied, *at an elevation of fifteen feet.* The relation of this obligation to the business of street sprinkling is not perceived.

The city of New Orleans owns the waterworks; she has full control, especially, of the hydrants in the streets; she has full control of the

McKnight v. The City of New Orleans.

streets as public highways. Her administrators have a large discretion in the management of her property and the police of her thoroughfares. The water that flows through her hydrants is pumped up from the river at great cost, and it is matter of public notoriety that the supply for more important purposes than laying dust is frequently inadequate. She might declare that it was better that her citizens should suffer from dust than from conflagration, and decline to furnish any water for street sprinkling; she might, probably, prohibit the business of street sprinkling as a private pursuit, which she now merely tolerates, if it seemed, as it might, to be an interruption to the free use of the thoroughfare; and we see no good reason why, in the exercise of a similar discretion—which the judiciary should be careful not to question or infringe—she may not lawfully dispose of the privilege of drawing water for sprinkling streets to the highest bidder, and thus *pro tanto* lighten the burden of the tax-payer.

In the recent case of the Eclipse Towboat Company *v.* the Pontchartrain Railroad Company, 24 An., p. 1, we had occasion to decide that when a railroad was under no legal obligation to "pro rate" through freight with any one, a refusal to pro rate with the plaintiffs was not illegal, nor did it become illegal, because the railroad had made an arrangement upon sufficient consideration to pro rate with some one else. This case seems to be one in point.

It is therefore ordered that the judgment appealed from be reversed and the verdict set aside, and that there be judgment in favor of defendants, with costs in both courts.

WYLY, J., *dissenting.* The plaintiff alleges that he has been engaged for several years in the business or occupation of sprinkling the streets of New Orleans; that in conducting it he has been compelled to keep a large number of mules, carts, drivers and stables, in which he has a large capital invested; that the city of New Orleans has heretofore furnished him the necessary water for said business from the waterworks; that he would not have engaged in, nor invested his capital in, said business except for the facilities afforded by said waterworks, and the inducements held out by the habit of furnishing water for that purpose; that the city of New Orleans furnished him water for said business during the whole of the year 1870, for which he paid punctually; that he applied for water for said purpose during the year 1871, and was absolutely and illegally refused it by the city; that he applied for and proposed to use ten thousand gallons per day in his said business, which is the customary amount, and tendered the city the money for that quantity for the whole year, 1871, according to the regular tariff for water established by said city, but was refused without any

lawful cause; in consequence of which his business was entirely broken up, and he was deprived of a legitimate occupation, worth to him fifteen thousand dollars annually. He therefore prays for twenty thousand dollars damages. The defendant pleaded the general denial; specially denied the right of every citizen, upon tendering the payment of the public water rates, to obtain daily from the waterworks water to sprinkle the streets of New Orleans, the said waterworks being established to accommodate the citizens for ordinary purposes sufficient for the use of families, etc. The defendant also denied that the plaintiff ever had any serious purpose of paying the water rates in such quantity, but believes he merely so pretended with the view of being refused, and then bringing his action for damages.

The case was tried by a jury, and resulted in a verdict and judgment in favor of plaintiff for five thousand dollars damages. It appears that the business of sprinkling the streets, for such compensation as the owners of property might voluntarily agree to give, is an ancient occupation in this city, and that the plaintiff pursued it in 1869 and 1870, obtaining the water from the public waterworks; it is shown that he had considerable capital invested, and that it was becoming very profitable, yielding a net income in 1870 of eight thousand dollars; that early in 1871 he made contracts for sprinkling the streets, having many new subscribers, but that the city of New Orleans refused to allow him to get water for the purpose of continuing his business from the public waterworks, although he tendered the money to pay the public water rates; and in consequence his business was broken up.

Early in 1871, the Administrator of the Department of Waterworks wrote the following letter to the plaintiff: "The city of New Orleans having disposed of the *privilege of water* from the plugs of the city waterworks, for street sprinkling purposes, for one year from first of January, 1871, unto Joseph Elliott, Esq., the application made by you this day for similar privileges can not be entertained."

I think the plaintiff had the right to get the water necessary for his business from the public waterworks, on paying the usual tariff or water rates; that the Aministrator of Waterworks Department was wholly unauthorized to refuse it when the money was tendered; and that he had no right to create the monopoly in favor of Elliott, by giving him the exclusive use of the plugs of the city waterworks for the purpose of sprinkling the streets.

For over thirty-five years various persons have pursued the occupation of sprinkling the streets for such compensation as the occupants of dwellings and business establishments might agree to pay them, the privilege of getting water from the waterworks being free to all who were willing to pay the regular water rates.

It was not till after the city purchased the waterworks from the Commercial Bank, in 1868, that the monopoly complained of was established.

Now, because the plaintiff enjoyed the exclusive "*privilege of water from the plugs*," in 1869 and 1870, and also bid for it in 1871, is no reason why he should not complain of the monopoly, if it is wrong in principle, and if it is unauthorized by the charter granted by the State to the Commercial Bank of New Orleans, from whom the city acquired it. Of course the plaintiff had no cause to complain as long as he could get the water; and, besides, it seems he was willing to pay the sums he did in 1869 and 1870 for the *exclusive privilege*. But when he was denied it he had cause to complain, provided the monopoly was wrong. An illegal and arbitrary exercise of power may be inquired into at any time the person or persons affected thereby may feel aggrieved.

Because the city or its official abused a trust in 1869 and 1870, is no reason why it should do so with impunity in 1871.

What was the object of the charter, the contract between the State and the corporation, called the Commercial Bank of New Orleans, granted in 1833 ? It was obviously to supply the city of New Orleans and its inhabitants amply with water, at a fair price, not only for the ordinary use of families, but for every purpose necessary for the health, convenience and safety of the city and its population. The thirty-eighth section of the charter requires said company "to place hydrants at a suitable distance from each other, from which a sufficient quantity of water may conveniently be drawn for extinguishing fires, *and for wetting, washing and sprinkling the streets*." The fourth section provides that after thirty-five years New Orleans may purchase the waterworks from the company; and this was done, as before remarked, in 1868.

Now, I think it will not require serious argument to prove that this perpetual charter or contract between the State and the Commercial Bank has not been altered, so far as the rights of the inhabitants of New Orleans are concerned, by the transfer thereof to the city in 1868. The city has, by the purchase, merely succeeded to the rights and obligations imposed on the original incorporators by the charter or contract between them and the State. Under the purchase, which was anticipated when the charter was granted, the city is bound to carry out the contract and perform all the obligations thereof in favor of the inhabitants, the real parties for whose benefit the charter or contract was made by the State.

New Orleans as a legal entity, had no interest in the contract whatever. The inhabitants own the city, and are the parties intended to be benefited by the stipulations in the charter. They are the obligees of the contract, and, in my opinion, can compel the city to perform the obligations thereof which she assumed when she became the purchaser of the waterworks.

27

There is no force in the objection that the stipulation of section thirty-eight is in favor of the city, and therefore the inhabitants can not complain if they are not furnished water to extinguish fires and to sprinkle the streets. This is a mere fallacy. The provision is really in favor of the inhabitants, who alone are interested in preserving their property from fire, and whose health and comfort would be advanced by sprinkling the streets. New Orleans, as a juridical person, or legal entity, needs no water. The consumers of water are the people who inhabit the city. The stipulation, therefore, of section thirty-eight of the charter, requiring the incorporators to place hydrants at suitable distances in order to furnish a sufficient quantity of water for extinguishing fires, and for "*wetting, washing and sprinkling the streets*," is for the benefit of the inhabitants; and they have the right to complain if they are denied the privilege of getting water freely from these public hydrants.

The charter would cease to be a contract if the city, by the purchase, acquired all the rights and privileges of the waterworks company, and incurred none of the corresponding obligations. The State might at once incorporate another company, and would not, in doing so, impair the obligation of a contract.

The right of the city to control the waterworks would cease, because the basis of her title, the contract made by the State with the incorporators can not exist without reciprocal obligations. So, therefore, if the city has the rights of the Commercial Bank, resulting from the purchase, to administer the public waterworks, it also is bound to perform the corresponding obligations of its vendor.

The contract being a perpetual one, made by the State for the benefit of the inhabitants, their rights were not destroyed by the transfer from the original incorporators to the city of New Orleans in 1868.

The inhabitants of New Orleans are not deprived by it of their rights; and they have just cause to complain, if they are not amply supplied with all the water necessary for their comfort and convenience, as well as their actual necessities.

They have the right to demand from the waterworks sufficient water to sprinkle the streets in front of their houses; they have the right to employ the plaintiff to perform this service for them; and the Administrator of the Department of Waterworks had no right to refuse to supply him the necessary water, when the usual price thereof was tendered.

It is not pretended that there was not sufficient water to supply the plaintiff; the defense is simply a general denial; a special denial of the right of the citizen to demand more than is necessary for family purposes; and an averment that the plaintiff was not serious in tendering the money and demanding the water from the waterworks. If

the plaintiff was not serious, why refuse him ? Why decline to take the money ? But the evidence shows that the plaintiff was building up a very profitable business; it yielded him a net profit of eight thousand dollars in 1870, and he was already employed by numerous persons to sprinkle the streets in 1871, having many new subscribers.

The actual loss he sustained was not only that resulting from the sale of his carts and mules, but the loss resulting from the breaking up of his business.

If the defendant had no right to refuse him water from the public waterworks, and in consequence thereof the business which he had built up was destroyed, he has a just ground to claim remuneration for the loss of that business. The jury found the actual loss sustained by the plaintiff was five thousand dollars, and I think the evidence in the record fully sustains their verdict.

If the position of the defendant be true, the provision of section thirty-eight of the charter of the waterworks is meaningless. For it would be useless to require the incorporators to place hydrants at suitable distances to supply ample water to extinguish fires and for "*wetting, washing and sprinkling the streets*," if the people would have no right to use the water in those hydrants for that purpose.

What is the use of providing the hydrants if those to be benefited thereby have not the right to use them ? If the people have no right to sprinkle the streets, why cause hydrants to be erected for the purpose ?

But defendant contends that it has conferred this duty upon Elliott for the year 1871, and he paid it two thousand dollars for the privilege.

Here is another fallacy. Elliott has made no contract with the city binding him to sprinkle the streets. He is not required to cast a single drop of water on the streets. He has simply purchased "*the privilege of water from the plugs of the city waterworks*" for the year 1871. He gave the pittance of two thousand dollars for the exclusive privilege, and he is not bound to use it; he can refuse to sprinkle the streets; and yet the inhabitants are forbidden from getting water from the public fountain for that purpose for a whole year. If the administrator had the right to sell Elliott the exclusive "*privilege of water from the plugs*" for one year he could do so for any number of years; and thus "the plugs" might be permanently closed, and the inhabitants deprived of one of the main objects of the waterworks.

Where is the right of those entrusted by the State with the administration of the public waterworks to sell out and destroy the rights they were charged to protect and to administer ? Are the duties and obligations imposed by the State in the act of incorporation upon the Commercial Bank and its transferree thus to be disregarded ; the object of the charter thus to be defeated, and the rights of the citizens in-

tended to be preserved, thus *bargained away* by those intrusted with the administration of a public institution? Suppose the Gas Company, another public institution, or an institution established for the benefit of the inhabitants of New Orleans, should pursue the same course adopted by the Administrator of the Waterworks, and sell out the privilege of gas from its reservoir to a single person for a year, would the citizens have no cause to complain? Are the citizens to be shut off from the waterworks and to be shut off from the gas works according to the whims or caprices of those administering these public institutions? Surely not. The incorporators have contracted with the State; they acquired certain rights and privileges, and they incurred corresponding obligations to be performed for the benefit of the inhabitants of New Orleans.

In Scudder *v.* Paulding, 4 Robinson 429, where the gas company refused to supply the lessee of the Planters' Hotel because the former tenant had failed to pay his gas bill, this court held—that the lease entitled the plaintiff to call on the company for gas on offering to pay for it; and if he was improperly refused, his "remedy was against the company."

Here the plaintiff called upon the Administrator of Waterworks and tendered him the price for water to sprinkle the streets; he was improperly refused, as I believe, and his remedy is against the defendant, who by the purchase of 1868 succeeded to all the duties and obligations, as well as the rights of the original incorporators.

But the defendant contends that New Orleans had the right to refuse the plaintiff the water, in the exercise of its police power. If the use of the water at the time was detrimental to good order, to the safety and health of the public, or if the way it was used was a nuisance, of course the city in the exercise of its police power had the right to do so; it has the right to regulate the use of the gas also in the proper exercise of police power; it had the right to regulate the use of water while the waterworks were administered by the original incorporators.

But the best answer to this objection is: the city has not seen fit to impose any restriction on the plaintiff in the exercise of its police power. The plaintiff was not refused on account of the exercise of police power by the city. The right of the city in relation to the exercise of police power is not involved in this case; it is not an issue raised by the pleadings or an issue upon which the parties went to trial in the court below. It is an after-thought, a mere dodge suggested by the ingenuity of counsel. It can not avail to confuse the real merits of the controversy, and to bolster up a defense which, in my opinion, rests upon no solid foundation in law or equity. For the reasons stated I deem it my duty to dissent.

Rehearing refused.